IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LUCAS M. IVERS,<br><br>    *Plaintiff,*<br><br>v.<br><br>BRENTWOOD BOROUGH SCHOOL DISTRICT, *et al*,<br><br>    *Defendants.* | Civil Action No. 2:20-cv-1244<br><br>Hon. William S. Stickman IV |

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

In August 2020, Lucas M. Ivers ("Ivers") filed a complaint in the Court of Common Pleas of Allegheny County, Pennsylvania against Brentwood Borough School District ("School District"), Floyd Olsavicky ("Olsavicky"), Aggie Greer ("Greer"), Brentwood Emergency Medical Services ("Brentwood EMS"), and a minor, N.M. (ECF No. 1-2). The case concerns an alleged assault of Ivers by N.M. during gym class. Defendants collectively removed the case to this Court in late August 2020. (ECF No. 1). Defendants that remain in the case are Greer, Brentwood EMS,[1] and N.M. Greer has moved for summary judgment as to the only count against her – Count II in the amended complaint (ECF No. 25, pp. 9-11). For the following reasons, Greer's Motion for Summary Judgment ("motion") (ECF No. 62) will be granted and summary judgment will be entered in favor of Greer.

---

[1] On July 11, 2022, Ivers executed a pro rata Release in favor of Brentwood EMS. (ECF No. 55). Brentwood EMS was then permitted to file an Amended Answer and New Matter to Ivers's Amended Complaint for purposes of asserting the Joint Tortfeasor Release. (ECF Nos. 55, 56 and 57).

1

I.  STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof[]" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007). However, "a complete failure of proof concerning an essential element" of the non-movant's claim "necessarily renders all other facts immaterial," and thus "there can be 'no genuine [dispute] as to any material fact'" sufficient to survive the motion. *Celotex*, 477 U.S. at 323; *accord Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) ("[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.").

II.  FACTUAL BACKGROUND

On June 5, 2018, Ivers and N.M. were students at Brentwood High School. While in gym class in the gymnasium playing against one another in a basketball game, N.M. became angry with Ivers, and after becoming entangled, N.M. lifted Ivers onto his shoulders and then

slammed Ivers to the ground. Ivers believed that N.M. intended to seriously injure him. (ECF No. 64, p. 2; ECF No. 70, p. 10).

Greer, the school nurse, was instructed to report to the gymnasium. She had been working for the School District since 2014.[2] (ECF No. 64, p. 1; ECF No. 70, p. 1). She arrived at 1:15 p.m. and saw Ivers lying face down on his stomach on the floor positioned underneath one of the basketball hoops. The gym teacher told Greer that Ivers was thrown to the ground, landing on his shoulder. Ivers told Greer that "[N.M.] slammed me," and that he hurt all over and could not move. (ECF No. 64, p. 3; ECF No. 70, pp. 2, 9). Greer knew that the examination for someone who may have suffered trauma included assessment, diagnosis, outcomes identification, planning, implementation, and evaluation. (ECF No. 63-2, p. 8). According to Greer, Ivers asked her to massage his shoulder, but she only felt it for displacement or to see if anything was out of the ordinary. Ivers was alert and answered all of her questions appropriately.[3] (ECF No. 64, p. 3; ECF No. 70, pp. 2-3).

Greer performed a neurological "head-to-toe" assessment of Ivers, which Ivers believes was deficient. He claims he told her numerous times that he could not move and could not feel portions of his body. Ivers admits that Greer examined his neck and spine. Greer confirmed that Ivers could feel his hands on her hands, that he could push her hand with each of his feet, and that he could squeeze her finger with both hands with equal strength. Ivers never told Greer that his hands were tingling. Based on her assessment, Greer did not believe Ivers had a concussion or spinal cord injury as he did not have a headache and could move all four of his limbs.

---

[2] The handbook she was originally provided by the School District contained a section for addressing students who may have suffered spinal trauma. She also had materials from the National Association of School Nurses and the Pennsylvania School Nurse and Practitioners. (ECF No. 63-2, pp. 7-8; ECF No. 64, pp. 1-2; ECF No. 70, p. 1).

[3] Ivers cannot now recall any questions Greer asked or what he said to her.

However, she was concerned that Ivers suffered a serious injury to his shoulder. (ECF No. 64, pp. 3-4; ECF No. 70, pp. 3-4, 9; ECF No. 74, p. 1).

Ivers requested that Greer move him, and she initially declined to do so. According to Ivers, five minutes after Greer's arrival, she slid him approximately ten feet to a gymnasium wall with her hand on his back.[4] Brentwood High School had a standing order not to move individuals suspected of suffering spinal injuries, but Greer did not think Ivers had suffered such an injury. When the paramedics arrived at 1:34 p.m., Ivers was sitting up with his back against the gym wall. Less than twenty minutes had elapsed between Greer's arrival in the gymnasium and the arrival of the paramedics. Greer reported to the two responding paramedics that Ivers had fallen during a basketball game, was complaining of all over pain, and had movement in all of his limbs. According to Ivers, Greer stated he was "fine" and it was okay for the paramedics to lift him. Greer told the paramedics that she checked Ivers's neck and found no pain or deformities. (ECF No. 64, pp. 4-6; ECF No. 70, pp. 4-6, 10; ECF No. 74, pp. 13-14).

Ivers complained of shoulder pain and tingling hands to paramedic Michael Backus ("Backus"). Ivers did not complain about any back or neck pain. Backus conducted a neurological exam of Ivers and found that he was alert, oriented, knew where he was, and could move all of his limbs – his legs, feet, arms and hands. Ivers had the highest possible score of 15 on the Glasgow Coma Scale, and he had normal motor and sensory reactions. It was Backus's belief based on his assessment that Ivers had not suffered a spine injury and stabilization/immobilization was unnecessary. The paramedics intended to transport Ivers to a hospital. Greer did not make any recommendations as to what the paramedics should do with Ivers. (ECF No. 64, pp. 4-8; ECF No. 70, pp. 4-7).

---

[4] Greer disputes that she moved Ivers. However, for purposes of her summary judgment motion, she assumes that she moved him. (ECF No. 64, p. 4 n.1; ECF No. 74, pp. 13-14).

Ivers's mother, Catherine Ivers, arrived and saw her son on a stretcher. She expressed concern that Ivers's shoulders appeared crooked – his left shoulder looked lower. Paramedics told her that Ivers was fine, and that they and the nurse had checked him. Neither Greer, the paramedics, nor Catherine Ivers believed Ivers was seriously injured. Ivers told his mother that his arm and hand hurt, but he was "okay." Catherine Ivers acknowledged that she may have said to her son that he was acting like a baby. She told Ivers to get off the stretcher, and she also told the paramedics that they would go to MedExpress on their own. The paramedics left the school at 2:07 p.m. (ECF No. 64, pp. 7-8; ECF No. 70, p. 7).

When exiting the school, Ivers told his mother that his hand hurt. Catherine Ivers drove Ivers to the MedExpress and parked, but they did not go inside for treatment because she thought he had broken his arm or wrist. It was her belief that MedExpress would send them to Children's Hospital, and she thought about going there instead. Ultimately, she decided against that and drove home. On the way, Ivers told her that nothing hurt. Once home and sitting in their vehicle in the driveway at approximately 4:00 p.m., Ivers said he as fine, but that his hand hurt. Catherine Ivers's car was very low to the ground, and she was lifting Ivers out of the car. (ECF No. 64, pp. 8-9; ECF No. 70, p. 7). She explained, "once he got to a certain point, he just slid down my body. Actually, when he rested, he came down at my feet." (ECF No. 64, p. 8; ECF No. 63-2, p. 219). She called 911, and an ambulance arrived at 4:08 p.m. (ECF No. 64, p. 9; ECF No. 70, p. 8).

According to Ivers, he sustained quadriplegia that resolved, a C5 fracture, C5-C6 traumatic disc herniation, and spinal cord contusion at C5 with edema. He had the following surgeries: anterior cervical diskectomy and fusion at C5-C6, posterior laminectomies at C4-C6,

and segmental fusion from C4-C6 with lateral mass screws. (ECF No. 70, p. 12; ECF No. 74, p. 15).

Greer obtained an expert, Jennifer S. McCulloch, M.Ed., RN, who issued an October 7, 2022, report after reviewing documents and videos, conducting interviews, and conducting professional research. (ECF No. 63-2, pp. 125-34). She offered her opinion within a reasonable degree of certainty that:

1. Aggie Greer acted professionally and appropriately when caring for and attending to Lucas Ivers on June 5, 2018.

2. Aggie Greer followed the Standard of Practice recognized by the National Association of School Nurses (NASN, 2017).

3. Aggie Greer followed the applicable and appropriate standard of care according to research based on interventions from the literature (Schwab, 2005, Selekman, 2019).

4. Aggie Greer followed the applicable and appropriate standard of care set forth in the Brentwood School District Nurse Handbook and the Brentwood School District Standing Order for First Aid.

                    *       *       *

9. Upon reviewing standards of care against the actions of Aggie Greer, it is evident from her nursing notes and from the interviews that she carried out her assessment and that her interventions were appropriately performed and that she met the standards of care.

10. When responding to reports of spinal injuries, school nurses must make decisions quickly, under pressure and without the luxury of a second chance or a second opinion. Instead, they must make either split-second decisions or act within minutes upon arrival at the scene.

11. In the present case, the incident occurred at approximately 1:15 p.m. and the EMT[]s arrived at 1:34 p.m. Accordingly, Aggie Greer only had minutes to evaluate and care for Lucas Ivers before the EMT's arrival.

12. Assuming that the allegations in the Amended Complaint against Aggie Greer are true, namely that she failed to stabilize Lucas Ivers's neck, back or spine and instead slid him to the wall with her hand on his back and told arriving EMT's that he was "fine" and that it was "okay" to lift him without spinal stabilization, Aggie Greer's conduct does not shock the conscience because

6

>   she did not take these actions to deliberately harm Lucas Ivers. She did not
>   consciously disregard a substantial or great risk that serious harm would result
>   if she took such actions because, as set forth above, her neurological exam
>   was normal. According to her assessment of Lucas Ivers, he did not exhibit
>   signs or symptoms of a concussion or a spinal cord injury. Lucas Ivers had a
>   normal neurological examination at the time of Aggie Greer's assessment.

(*Id*. at 132-33).

Despite the fact that Ivers's claim against Greer pertains to her standard of care, he did not seek an expert to address or render opinions about Greer's allegedly harmful conduct. Expert reports were to be served by October 8, 2022. (ECF No. 54). On January 31, 2023, three weeks after Greer filed her motion and just days before his response was due, Ivers filed a Motion for Leave to Amend Case Management Order Deadline, seeking permission to reopen expert discovery to obtain and serve an expert report to support his claim against Greer. (ECF No. 65). The Court denied his request. (ECF No. 69).

### III.   ANALYSIS

Ivers's claim against Greer is for a violation of his substantive due process under the Fourteenth Amendment due to the injuries he suffered as a result of N.M.'s physical attack and her medical treatment thereafter in the school gymnasium. The Due Process Clause provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Ivers invokes the substantive component of due process, which "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citation omitted). The United States Court of Appeals for the Third Circuit has recognized that "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (citation omitted); *see also Ingraham v. Wright*, 430

7

U.S. 651, 673 (1977) ("Among the historic liberties so protected [by the Due Process Clause] was a right to be free from and obtain judicial relief, for unjustified intrusions on personal security."). However, the Due Process Clause does not impose an affirmative obligation on the state to protect its citizens against private violence. *See DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 195–96 (1989). The Due Process Clause forbids the state *itself* from depriving "individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* at 195. In a system of limited government, no government—federal, state or local—can be charged with the obligation or authority to guarantee that harm will not befall its citizens from the acts of their fellow citizens.[5]

The claim Ivers brings against Greer is based on a state-created danger theory of liability – *i.e.* that Greer created (or exacerbated) a dangerous situation for him. Ivers faults Greer for not adequately examining and stabilizing him, for sliding him to the wall with her hand on his back, and for telling paramedics he was fine and it was "okay" to lift him without spinal stabilization. (ECF No. 25, p. 3). He argues that Greer had "a duty to adequately examine, stabilize and care for [him] so as to avoid further injury to him," and that she failed to stabilize his neck, back and/or spine when he exhibited clear symptoms of spinal trauma. (*Id.* at 10). He alleges that Greer was "deliberately indifferent" to him because "she observed the obvious and substantial harm and injury" to him, and "not only failed to adequately and safely take the necessary steps to treat [him], but worsened [his] condition through her actions and/or inaction." (*Id.* at 11).

---

[5] Courts have recognized a governmental duty to protect where there is a "special relationship" between the state and an individual. *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013) (en banc). The Third Circuit has conclusively held that such a relationship does not exist between schools and their students. *Id.* at 167-77.

8

The state-created danger theory is a limited exception to the general rule that "nothing in the language of the Due Process Clause itself requires the state to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney*, 489 U.S. at 201. It is a way for liability to attach where the state acts to create or enhance a danger that, when realized, deprives a plaintiff of his or her Fourteenth Amendment right to substantive due process. The Third Circuit recognized the state-created danger theory of liability over two decades ago, *see Kneipp v. Tedder*, 95 F.3d 1199, 1211-13 (3rd Cir. 1996), and it has developed the following four-prong test to establish whether a claim is meritorious:[6]

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts" or a "member of a discrete class of persons subjected to the potential harm brought about by the state's actions," as opposed to any member of the public in general; and

(4) the state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006). In order to maintain a claim under the state-created danger theory, Ivers must satisfy *all* four prongs.

After extensive discovery, Ivers cannot point to evidence sufficient to satisfy this test. Ivers's reliance on his own testimony and the Court's denial of a motion to dismiss Count II in

---

[6] Recently, a panel of the Third Circuit expressed its view that the full Court should revisit the state-created danger theory finding it to be a "troubling" expansion of substantive due process. *Johnson v. City of Philadelphia*, 975 F.3d 394, 404-05 (3d Cir. 2020). The Honorable Paul B. Matey, in a concurring opinion, noted that the "Due Process Clause of the Fourteenth Amendment 'does not transform every tort committed by a state actor into a constitutional violation.'" *Id.* at 404 (citation omitted). The panel accurately noted that "the 'state-created danger' doctrine offers little help to public employees seeking to better discharge their duties, and does not tell them 'what to do, or avoid, in any situation.'" *Id.* at 400.

the early stages of this case,[7] is insufficient to defeat Greer's motion. At the summary judgment stage, Ivers cannot rest on the unsubstantiated allegations of his pleadings. Ivers "cannot create an issue of fact merely by ... denying averments ... without producing any supporting evidence of the denials." *Thimons v. PNC Bank, NA*, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." *Lockhart v. Hoenstine*, 411 F.2d 455, 458 (3d Cir. 1969) (internal citation omitted). Further, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985) (citation omitted). A non-moving party must "go beyond the pleadings" with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate probative evidence creating a triable controversy. *Celotex*, 477 U.S. at 324. Ivers has failed to produce evidence such that a reasonable jury could return a verdict for him and against Greer under the state-created danger theory of liability. To submit his claim to a jury would require it to engage in speculation.

   A. **The harm caused was not foreseeable and not fairly direct.**

Ivers cannot satisfy the first prong of the test. He has failed to adduce affirmative evidence that the harm ultimately caused to him was foreseeable and fairly direct. To make out foreseeability, a plaintiff must "allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips*, 515 F.3d at 238. Foreseeability of harm is assessed from the perspective of the state officers who take the risk-creating action. *See, e.g., Mann v.*

---

[7] Many aspects of the test for state-created danger theory involve questions of law for the Court decide. It permitted Count II to proceed to discovery so that it had a more fully developed factual record to resolve the viability of Ivers's state-created danger claim against Greer.

*Palmerton Area Sch. Dist.*, 872 F.3d 165, 171 (3d Cir. 2017), as amended (Sept. 22, 2017) (analyzing foreseeability from the perspective of a football coach who told a concussed student to continue practicing); *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 245 (3d Cir. 2016) (analyzing foreseeability from the perspective of a teacher who released a young student to a stranger); *Phillips*, 515 F.3d at 238–39 (analyzing foreseeability from the perspective of two 911 operators who provided personal information to a dangerous criminal). An official's actions are the "fairly direct" cause of the harm if the actions "precipitated" or were the "catalyst" for the harm that occurred. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997). The actions must be close in time and progression to the ultimate harm, and it is insufficient if the causation is so attenuated that the official's actions merely "took place somewhere along the causal chain that ultimately led to the [victim's] harm." *Henry v. City of Erie*, 728 F.3d 275, 285 (3d Cir. 2013).

Uncontracted evidence reveals that none of the responding medical professionals (Greer and the two paramedics) were aware that Ivers suffered a spinal cord injury. In fact, they all separately concluded that he did not have a spinal cord injury. Thus, no evidence supports the proposition that Ivers's injuries were a foreseeable result of Greer's conduct at the time she interacted with him in the gymnasium. This is especially true given that it is undisputed that the severity of Ivers's injuries did not fully emerge until nearly three hours later when his mother removed him from her car and he fell out of her arms to the ground.

Additionally, causation is too attenuated to be fairly direct in light of the factual record before the Court. After Greer allegedly moved Ivers without stabilizing him, the paramedics placed Ivers on a stretcher in the gymnasium without stabilizing him. Then, his mother had him get up from the stretcher and walk to her car. Ivers sat in the car while she drove to MedExpress

and then home. When they got home, she attempted to lift him out of the vehicle, and Ivers fell to the ground. Ivers failed to elicit any expert opinions or reports directly linking Greer's conduct to his injuries. Greer's conduct was just one event that occurred in a chain of possible causes. Although Ivers is dissatisfied with Greer's medical care and believes she ignored his statements that he could not move and could not feel portions of his body, the Court finds no genuine issue of material fact exists as to the first element of his state-created danger claim.

### B. Greer did not act with a degree of culpability that shocks the conscience.

Ivers, likewise, cannot satisfy the second prong of the test. No evidence has been adduced that Greer acted with a degree of culpability that shocks the conscience. This element of the state-created danger theory "is often the most difficult for a plaintiff to show, and thus [the] ultimate conclusion frequently turns on [the] determination of whether given conduct 'shocks the conscience.'" *Estate of Smith v. Marasco*, 430 F.3d 140, 153 (3d Cir. 2005). The Third Circuit has stressed that "[t]he exact level of culpability required to shock the conscience ... depends on the circumstances of each case, and the threshold for liability varies with the state actor's opportunity to deliberate before taking action." *Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017).

In "'hyperpressurized environments requiring a snap judgment,' an official must actually intend to cause harm in order to be liable." *Id.* (alteration omitted) (quoting *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015)). "In situations in which the state actor is required to act 'in a matter of hours or minutes,' ... the state actor [must] 'disregard a great risk of serious harm.'" *Id.* (quoting *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006) (per curiam)). "And where the actor has time to make an 'unhurried judgment[ ],' a plaintiff need only allege facts supporting an inference that the official acted with a mental state of 'deliberate indifference.'" *Id.*

(alteration omitted) (quoting *Sanford*, 456 F.3d at 309). The relevant inquiry is whether the state actor "consciously disregarded a great risk of harm," with the possibility that "actual knowledge of the risk may not be necessary where the risk is 'obvious.'" *Sanford*, 456 F.3d at 310.

The gym teacher, Olsavicky, told Greer that Ivers was thrown to the ground, landing on his shoulder. Ivers told Greer that "[N.M.] slammed me," and he hurt all over and could not move. (ECF No. 64, p. 3; ECF No. 70, pp. 2, 9). Greer knew that the examination for someone who may have suffered trauma included assessment, diagnosis, outcomes identification, planning, implementation, and evaluation. (ECF No. 63-2, p. 8). Ivers was alert and answered all of her questions appropriately. (ECF No. 64, pp. 3; ECF No. 70, pp. 2-3). She performed a neurological "head-to-toe" assessment of Ivers as well as examining his neck and spine. Greer confirmed that Ivers could feel his hands on her hands, that he could push her hand with each of his feet, and that he could squeeze her finger with both hands with equal strength. Based on her assessment, Greer did not believe that Ivers had a concussion or spinal cord injury as he did not have a headache and could move all four of his limbs. Five minutes after her arrival in the gymnasium, she slid Ivers approximately ten feet to a gymnasium wall with her hand on his back. She did so because she did not think Ivers had suffered a spinal injury.

No facts were adduced that it was a highly pressurized environment for which a showing of intent to harm would be necessary. Even if the facts were viewed under such emergency circumstances, Ivers has not met the intent to harm standard. Greer did not shrink in her duty to provide medical care. She did not ignore Ivers and refuse to render aid. Instead, she delivered medical care, and it was her assessment that he suffered a shoulder injury. No intent to harm can be inferred from the evidence.

Although the Court does not view what transpired under the intermediate test (i.e. Greer was not confronted with a hyperpressurized environment, but nonetheless did not have the luxury of proceeding in a deliberate fashion), the record reflects that Greer did not disregard the risk of serious harm. It is not in dispute that Geer conducted an assessment of Ivers upon seeing him. Moreover, Ms. McCulloch has offered her expert opinion that Greer acted professionally and appropriately when caring for Ivers. She states that Greer followed the Standards of Practice recognized by the National Association Of School Nurses (NASN, 2017), and the applicable and appropriate standard of care according to research based interventions from the literature (Schwab, 2005, Selekman, 2019). Ivers has come forth with no evidence to refute this expert opinion, or otherwise show that Greer ignored Ivers and refused to render care. As the record stands, Greer did not disregard a risk of serious harm.

Lastly, under the deliberate-indifference test, which is what Ivers pled in his amended complaint, he has not adduced evidence to support his allegations. Deliberate indifference in the substantive due process context is governed by an objective standard: it exists "when the risk of harm is so obvious that it should be known." *Kedra*, 876 F.3d at 439. It requires more than negligence or medical malpractice. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). "[N]egligent behavior can never rise to the level of conscience shocking," *Kaucher v. County of Bucks*, 455 F.3d 418, 426 (3d Cir. 2006), because "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). *See also Schieber v. City of Philadelphia*, 320 F.3d 409, 419 (3d Cir. 2003) (stating "negligence is not enough to shock the conscience under any circumstances").

Greer has not produced evidence showing that Greer was deliberately indifferent. Fifteen to twenty minutes elapsed between Greer's arrival in the gymnasium and the paramedics' arrival. The uncontradicted facts are that Greer, after conducting her assessment, did not believe Ivers was seriously injured. She did not believe he had a concussion or spinal cord injury because he did not have a headache and he could move all four of his limbs. Although Greer was ultimately wrong in her assessment that Ivers suffered a shoulder injury, the record cannot support a finding that she was deliberately indifferent, which (as explained above) is a lower standard of care.

Greer has offered an expert report that her conduct was consistent with professional norms and cannot be found to shock the conscience. It opines that "[Greer] did not consciously disregard a substantial or great risk that serious harm would result if she took such actions because [ ] her neurological exam was normal. According to her assessment of Lucas Ivers, he did not exhibit signs or symptoms of a concussion or a spinal cord injury. Lucas Ivers had a normal neurological examination at the time of Aggie Greer's assessment." (ECF No. 63-2, pp. 132-33). No other evidence of record refutes this expert opinion. Ivers has not offered anything to counter this opinion. Thus, the evidence adduced in discovery is inadequate to satisfy a mental state of deliberate indifference to Ivers's medical needs by Greer that shocks the conscience. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) ("[C]laims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' ... We have found 'deliberate indifference' ... where [a] prison official ... knows of a prisoner's need for medical treatment but intentionally refuses to provide it." (emphasis added)).

Ivers has not demonstrated a genuine dispute of material fact on the second element of the test for state-created danger. Greer's actions cannot be said to have shocked the conscience.

The Due Process Clause is not a guarantee against incorrect or inadequate medical care. The Court will grant summary judgment in Greer's favor.[8] Because the lack of evidence is sufficient to resolve the state created-danger claim against Greer, the Court need not address her entitlement to qualified immunity.[9]

---

[8] Given that Ivers has failed to adduce evidence demonstrating the requisite level of fault as to Greer, his claim can go no further. However, the Court notes that he has also failed to adduce evidence to satisfy the fourth prong of the test – that Greer created or increased the risk of harm to him by virtue of her actions. This element of a state-created danger claim "asks whether a defendant exercised his or her authority to create a foreseeably dangerous situation." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006). In other words, "[t]here must be a direct causal relationship between the affirmative act of the state and plaintiff's harm." *Id*. The state's action should be the "but for" cause of the danger faced by the plaintiff. *Id*. "It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 282 (3d Cir. 2006). Greer was initially responsible for administering medical care to Ivers. She examined Ivers and concluded that he had not suffered a spinal cord injury. The link between her conduct (i.e., failing to stabilize Ivers, moving him across the gym floor, and telling paramedics that it would be okay to lift him without spinal stabilization) and his resulting injuries is (1) too attenuated given the record evidence of the intervening circumstances and (2) not supported by the record given that Ms. McCulloch's expert report concludes that Greer adhered to reasonable standards of care and acted professionally and appropriately. Ivers failed to adduce a genuine issue of material fact that Greer created or enhanced a danger to Ivers.

[9] The doctrine of qualified immunity shields government actors from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Zaloga v. Borough of Moosic*, 841 F.3d 170, 174 (3d Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether qualified immunity shields a government official's action from § 1983 liability, courts apply a two-step test and inquire (1) whether the facts alleged by the plaintiff establish a violation of a constitutional right and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation such that a reasonable official would understand that what he is doing violates that right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "When properly applied, [qualified immunity] [ ] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). If Ivers had adduced evidence supporting his state-created danger claim against Greer, the Court would have been inclined to find that Greer was entitled to qualified immunity. It is not beyond debate that the right allegedly infringed upon was a clearly established constitutional right.

## IV.  CONCLUSION

Greer's motion will be granted and summary judgment will be entered in her favor as to Count II. An Order of Court will follow.

BY THE COURT:

*/s/ William S. Stickman IV*

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Dated: **4-3-23**